UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE HUNTINGTON NATIONAL BANK, a
national banking association,

     Plaintiff,

v

BIG SKY DEVELOPMENT FLINT, LLC, a
Michigan limited liability company, BIG SKY
DEVELOPMENT GRAND RAPIDS, LLC, a
Michigan liability company, BIG SKY
DEVELOPMENT SALINE, a Michigan limited
liability company, IAN W. SCHONSHECK,
individually and AS TRUSTEE OF THE IAN W.
SCHONSHECK REVOCABLE LIVING TRUST
AGREEMENT DATED 12/11/90, AS AMENDED,
STEPHAN J. DACKIW,  individually and AS
TRUSTEE OF THE STEPHAN J. DACKIW
TRUST AGREEMENT, DATED 6/22/99,
RICHARD J. HARTIGAN, individually and AS
TRUSTEE OF THE RICHARD J. HARTIGAN
TRUST AGREEMENT, DATED 9/19/96, HYMAN
STOLLMAN, individually and AS TRUSTEE OF
THE HYMAN STOLLMAN REVOCABLE
LIVING TRUST, DATED 10/28/93, jointly and
severally,

     Defendants.

Case No.

Hon.

---

**COMPLAINT**

## SUMMARY OF CLAIM

1.      Plaintiff, the Huntington National Bank, a national banking association ("Huntington" or the "Bank"), brings this suit to collect payment of three loans made to defendants Big Sky Development Flint, LLC, Big Sky Development Grand Rapids, LLC, and Big Sky Development Saline, LLC and to foreclose the mortgages securing the loans. Additionally, Huntington is seeking the appointment of a receiver over the properties and is also seeking repayment of the loans from the remaining defendants who guaranteed one or more of the loans.

2.      All of the loans have matured, but remain unpaid.  Thus, the borrowers are in breach of the loan documents and the guarantor defendants are in breach of their guaranties.

3.      As of January 12, 2010, the amount owed by Defendants to Huntington on the three loans in aggregate,[1] exceeds $13 million, not including unpaid interest, default interest, real estate taxes, late fees, costs, expenses and attorneys' fees, which continue to accrue.

## PARTIES

4.      Huntington is a national banking association with its main office as set forth in its articles of association in Columbus, Ohio.

---

[1]  As will be discussed in detail below, the outstanding loan balance on the individual loans individually exceeds $3.4 million, $5.4 million, and $4.4 million.

5.      Upon information and belief, Defendant, Ian W. Schonsheck is an individual who is a citizen of and is domiciled in the state of Michigan at 51331 Pontiac Trail, Wixom, Michigan.

6.      Ian W. Schonsheck is also the trustee of Defendant the Ian W. Schonsheck Revocable Trust, dated December 11, 1990, as amended (the "Schonsheck Trust"), which is an express trust.

7.      Upon information and belief Defendant, Stephan J. Dackiw is an individual who is a citizen of and is domiciled in the state of Michigan residing at 7900 Poplar, Dexter, Michigan.

8.      Stephan J. Dackiw is also the trustee of Defendant the Stephan J. Dackiw Trust Agreement, dated June 22, 1999 (the "Dackiw Trust"), which is an express trust.

9.      Upon information and belief, Defendant, Richard J. Hartigan is an individual who is a citizen of and is domiciled in the state of Michigan residing at 12203 Woodline Drive, Fenton, Michigan.

10.      Richard J. Hartigan is also the trustee of Defendant the Richard J. Hartigan Trust Agreement, dated September 19, 1996 (the "Hartigan Trust"), which is an express trust.

11.      Upon information and belief, Defendant, Hyman Stollman is an individual who is a citizen of and domiciled in the state of Michigan residing at 19036 W. McNichols, Detroit, Michigan.

12.     Hyman Stollman is also the trustee of Defendant the Hyman Stollman Revocable Living Trust, dated October 28, 1993, as amended (the "Stollman Trust"), which is an express trust.

13.     Upon information and belief, Defendant, Big Sky Development Flint, LLC ("Big Sky Flint"), is a Michigan limited liability company.  Big Sky Flint has its principal place of business in Genesee County, Michigan and conducts business in that county.

14.     Upon information and belief, Big Sky Flint's members consist of the following: (a) Building Union Investment and Local Development Fund of Michigan Trust, which is an express trust whose trustee is Ameriserv Trust and Financial Services Company, who is a citizen of and is domiciled in the state of Pennsylvania (the "Building Union"); (b) Build II, LLC, a Michigan limited liability company, whose sole member consists of the Building Union ("Build II"); and (c) Big Sky Partners Two, LLC, a Michigan limited liability company ("Big Sky Partners Two"), whose members consist of the Schonsheck Trust, the Hartigan, the Dackiw Trust, and U.S. Storage Depot, LLC ("U.S. Storage"), which is a Michigan limited liability company, whose principal place of business is in Michigan, and whose sole member is Ronald A. Hagen.  Ronald A. Hagen is an individual who is a citizen and resident of the State of Michigan.

15.     Upon information and belief, Defendant, Big Sky Development Grand Rapids, L.L.C. ("Big Sky Grand Rapids"), is a Michigan limited liability company.  Big Sky Grand

4

Rapids has its principal place of business in Kent County, Michigan and conducts business in that county.

16.     Upon information and belief, Big Sky Grand Rapids's members consist of the Building Union and Big Sky Partners Two.

17.     Upon information and belief, Defendant, Big Sky Development Saline, LLC ("Big Sky Saline"), is a Michigan limited liability company.

18.     Upon information and belief, Big Sky Saline's members consist of the following:  (a) the Building Union; and (b) Big Sky Partners, LLC ("Big Sky Partners"), whose members consist of the Schonscheck Trust; the Hartigan Trust; the Dackiw Trust; the Stollman Trust; and U.S. Storage Depot.

19.     There are three parcels of real estate that are the subject of this action.  The parcels are located in the City of Flint, Michigan (the "Flint Property"), the City of Grand Rapids, Michigan (the "Grand Rapids Property"), and the City of Saline, Michigan (the "Saline Property").

20.     The Flint Property is located in the City of Flint, Genesee County, Michigan and is commonly known as 2219-2325 S. Dort Highway, Flint,  Michigan and is more particularly described as:

> Part of the West ½ of Northwest 1/4 of Section 21, Township 7 North, Range 7 East, described as beginning at a point on the West line of said section with is S.00°28'00"W., 772.24 feet from the Northwest corner of said Section 21; thence S.89°32'00"E., 282.44 feet; thence

5

S.61°51'12"., 549.84 feet; thence S.28°08'48"W., 175.00 feet; thence N.61°51'12"W., 438.18 feet; thence N.00°28'00"E., 3.92 feet; thence N.89°32'00"W., 300.00 feet to the West line of Section 21; thence N.00°28'00"E., 203.00 feet along said West line to the point of beginning. Subject to the rights of the public on Dort Hwy.

Parcel I.D. No. 41-21-101-049

21.     The Grand Rapids Property is located in the City of Grand Rapids, Kent County, Michigan and is commonly known as 2345 29th Street SE, Grand Rapids, Michigan and is more particularly described as:

Lots 10, 11 and 12, Breton Industrial Park, part of the NE 1/4, Section 16, T6N, R11W, City of Grand Rapids, Kent County, Michigan, as recorded in Liber 77 of Plats, Pages 1 and 2.

Parcel I.D. No. 41-18-16-245-001

22.     The Saline Property is located in the City of Saline, Washtenaw County, Michigan, and is more particularly described as:

Lot 1 of, "Sauk Trail Business Park", Part of the Southeast 1/4, Section 31, the Southwest 1/4 and the Northwest 1/4, Section 32, Town 3 South, Range 6 East, City of Saline, and Pittsfield Township conditionally transferred to the City of Saline, Washtenaw County, Michigan, as recorded in Liber 33 of Plats on Pages 5 through 18, W.C.R.

Parcel I.D. No. 18-12-31-480-001
(prior to split; Parcel I.D. No. 18-12-31-470-030)

6

## JURISDICTION AND VENUE

23.     Pursuant to 28 U.S.C. §1332(a), this Court has diversity jurisdiction over Huntington's claims because the amount in controversy exceeds $75,000, exclusive of costs and interest, and the action is between citizens of different states.  Huntington is a national banking association, and pursuant to the Supreme Court's ruling in *Wachovia Bank v. Schmidt et al.,* 546 U.S. 303 (2006), its citizenship for diversity jurisdictional purposes is where its main office is located as set forth in its articles of association, which is in Columbus, Ohio.  The Defendants are citizens of Michigan.

24.     Pursuant to 28 U.S.C. §1391(a)(1) and (2), venue is proper in this Court because each Defendant resides in Michigan and a substantial part of the events giving rise to this action occurred in the Eastern District of Michigan.

## FACTS UNDERLYING THE FLINT CLAIMS

### The Flint Loan Documents

25.     On August 14, 2003, Huntington extended a loan to Big Sky Flint (the "Flint Loan") pursuant to a Construction and End Loan Agreement entered into with Borrower, dated August 14, 2003, as amended by First Amendment to Construction and End Loan Agreement and Security Documents, dated September 19, 2005, as further amended by First Amendment to Promissory Note (End Mortgage Loan) and Second Amendment to Construction End Loan Agreement and Security Documents dated effective as of August 15,

7

2008, as further amended pursuant to a Second Amendment to Promissory Note (End Mortgage Loan) and Third Amendment to Construction End Loan Agreement and Security Documents, dated effective as of November 15, 2008. A copy of the Construction and End Loan Agreement, as amended (collectively, the "Flint Loan Agreement"), is attached as Exhibit 1.

26.    The Flint Loan was evidenced by a Promissory Note dated August 14, 2003 (the "Original Flint Note") in the original principal amount of Three Million Four Hundred Seventy-Five Thousand Five Hundred and No/100ths ($3,475,500.00) Dollars, as amended pursuant to the First Modification of Note dated September 19, 2005 and further converted into a term loan by that certain Promissory Note (End Mortgage Loan) dated August 15, 2006, as further amended pursuant to the First Amendment to Promissory Note (End Mortgage Loan) and Second Amendment to Construction and End Loan Agreement and Security Agreements, dated effective August 15, 2008, as further amended pursuant to Second Amendment to Promissory Note (End Mortgage Loan) and Third Amendment to Construction and End Loan Agreement and Security Agreements dated effective November 15, 2008. A copy of the Original Flint Note, as amended, converted and further amended (collectively, the "Flint Note"), is attached as Exhibit 2. The Original Flint Note, as converted and amended (the Flint Note), among other things increased the principal amount of the Flint Loan to Three Million Five Hundred Seventy Five Thousand Five Hundred and

No/100ths ($3,575,500.00) Dollars, converted the Flint Loan from a construction loan to a term loan and extended the maturity date of the Flint Loan to January 15, 2009.

27.     As security for the Flint Loan, Big Sky Flint executed and delivered to Huntington, among other things, a Construction Mortgage, which was dated August 14, 2003 and recorded on September 11, 2003 as Instrument Number 200309110122834, Genesee County Records, as amended pursuant to the first Amendment to Construction Mortgage, dated September 19, 2005 and recorded September 28, 2005 as Instrument Number 200509280094435, Genesee County Records.  A copy of the Flint Mortgage, as amended (collectively, the "Flint Mortgage") is attached as Exhibit 3.  The Flint Mortgage encumbers the Flint Property.

28.     To induce Huntington to make the Flint Loan, Ian Schonsheck and the Schonsheck Trust executed a Guaranty dated August, 2003, as amended and restated pursuant to the Amended and Restated Guaranty dated September 19, 2005 (collectively, the "Schonsheck Flint Guaranty").  (Ex. 4.)

29.     The Schonsheck Flint Guaranty, the "Flint Guaranty," and Ian Schonsheck will sometimes be referred to as the "Flint Guarantor" or the "Flint Guaranty Defendant."

30.     The Flint Guaranty Defendant, by Affirmation of Amended and Restated Guaranty dated effective as of November 15, 2008, further affirmed his Flint Guaranty by

9

confirming his respective Flint Guaranty shall apply to the Flint Loan, the Flint Note and Flint Loan Agreement, as amended and extended.  (Ex. 5.)

      31.    Pursuant to the terms of the Flint Guaranty, the Flint Guaranty Defendant, jointly and severally, unconditionally guaranteed the payment, when due, of all indebtedness owed under the Flint Loan Documents.

      32.    Pursuant to the Flint Loan Agreement, an Event of Default ("Default") includes the failure to make any payment due under the Flint Note or any of the Flint Loan Documents when and as required.  (Ex. 1, ¶8.1.)

      33.    Pursuant to the Flint Note and the Flint Mortgage, upon a Default, Huntington may, at its option, declare the entire unpaid indebtedness due and payable under the Flint Loan Documents without prior notice or demand.  (Ex. 1; Ex. 3 ¶12.)

      34.    Pursuant to the Flint Guaranty, upon a Default, Huntington may demand and obtain payment of all amounts due on the Flint Loan from the Flint Guaranty Defendant without first making a demand upon, pursuing or exhausting any remedy Huntington may have against Big Sky Flint.  (Ex. 4.)

      35.    Pursuant to the Flint Mortgage, Big Sky Flint was also required to pay the real estate taxes on the Flint Property.  So long as Big Sky Flint timely paid the real estate taxes, it was permitted to pay these real estate taxes directly, provided that evidence of that payment was submitted to Huntington.  (Ex. 3 ¶3.)  In the event however, Big Sky Flint failed to

timely pay the real estate taxes, Huntington, may, at its option, upon ten (10) calendar days prior notice, pay said taxes.  (Ex. 3 ¶6.)

36.     The terms of the Flint Mortgage further provide that failure by Big Sky Flint to pay the  real estate taxes shall constitute a waste. (Ex. 3 ¶8.)  The failure by Big Sky Flint to make any payments under the terms of the Flint Note, including the payment of real estate taxes is also a Default under the Flint Loan Documents.  The terms of the Flint Mortgage further provide that upon a Default, including the failure to timely pay the real estate taxes, Huntington is entitled to the appointment of a receiver as a matter of right.  (Ex. 3 ¶8.) Further, Big Sky Flint expressly consented to the appointment of a receiver upon a Default, and expressly waived any defense it may have to such appointment. (Ex. 1 ¶9.4; Ex. 3, ¶8.) Big Sky Flint also expressly consented to a receiver after filing a complaint to foreclose the Flint Mortgage.  (Ex. 1 ¶9.4.)

37.     As additional security for the Flint Loan, Big Sky Flint executed an Assignment of Leases and Rents, which was timely recorded with the Genesee County Records.  A copy of the Flint Assignment of Leases and Rents is attached as Ex. 6.

38.     Pursuant to the Flint Assignment of Leases and Rents, upon a Default, Huntington is entitled to receive and collect all rents from the Flint Property either personally or through a receiver.  (Ex. 6 ¶ 8(c).)

**Big Sky Flint's and the Flint Guaranty Defendant's Default**

39.     Under the terms of the Flint Note, the Flint Loan matured on January 15, 2009 (the "Flint Maturity Date").  Big Sky Flint was, on the Flint Maturity Date, required to pay in full, all unpaid principal, interest and other sums owed under the Flint Loan Documents. (Ex. 2.)

40.     Under the terms of the Flint Mortgage, Big Sky Flint was also required, in accordance with the procedures previously described, to pay the real estate taxes on the Flint Property.

41.     Big Sky Flint and the Flint Guaranty Defendant defaulted on their obligations under the Flint Loan Documents by failing to pay in full all unpaid principal, interest and other sums owed under the Flint Loan Documents, and by further failing to pay the real estate taxes on the Flint Property for 2007 and 2008 (collectively, the "Flint Payment Defaults"). The real estate taxes for 2007 and 2008 remain unpaid and owing.

42.     As a result of the Flint Payment Defaults, Huntington had the right to immediately exercise all of its rights and remedies under the Flint Loan Documents against Big Sky Flint and the Flint Guaranty Defendant including the right to accelerate and immediately collect all principal, interest and other sums due under the Flint Loan.

43.     As of January 12, 2010, the unpaid principal on the Flint Loan was $3,434,703.21.  Additionally, Big Sky Flint and the Flint Guaranty Defendant owe accrued

12

interest, late fees, real estate taxes, default interest, costs, expenses and attorneys' fees incurred prior to January 12, 2010, and which continue to accrue thereafter.

## CLAIMS RELATING TO THE FLINT LOAN

### COUNT I
**(Breach of the Flint Note and other Flint Loan Documents)**

44.     Huntington incorporates each and every preceding paragraph as if specifically alleged herein.

45.     The Flint Loan Documents were entered into for good and valuable consideration.

46.     Big Sky Flint has failed to pay the Flint Loan as required under the Flint Note and other Flint Loan Documents.

47.     Big Sky Flint has failed to pay the 2007 and 2008 real estate taxes on the Flint Property.

48.     By failing to pay the Flint Loan as required under the Flint Note and other Flint Loan Documents, and by failing to pay the real estate taxes, Big Sky Flint has breached the Flint Note and other Flint Loan Documents and a Default has occurred under the Flint Loan Documents.

49.     The Flint Note provides that without notice to Big Sky Flint, Huntington may declare the entire unpaid debt on the Flint Loan to be immediately due and payable.

13

50.     Big Sky Flint has a duty under the Flint Loan Documents to pay the outstanding principal, interest, real estate taxes, default interest, costs, expenses, attorneys fees and all other sums due under the Flint Loan Documents.

51.     Big Sky Flint has breached this duty by failing to pay the outstanding principal, interest, real estate taxes, default interest, costs, expenses, attorneys fees and all other sums due under the Flint Loan Documents.

52.     Huntington has been damaged by Big Sky Flint's failure to pay the outstanding principal, interest, real estate taxes, default interest, costs, expenses, attorneys fees and all other sums due under the Flint Loan Documents.

WHEREFORE, Huntington respectfully requests that this Court:

A.     Enter a judgment in its favor and against Big Sky Flint for the entire principal amount of the Flint Note, along with interest at the rate set forth in the Flint Note, including the default interest and any costs, fees and real estate taxes;

B.     Award all expenses and costs of collection, including attorneys' fees, incurred by Huntington in this or any other proceeding in connection with obtaining such relief; and

C.     Grant any and all further relief as the Court may deem to be fair, just, or equitable.

## COUNT II
### (Breach of Flint Guaranty)

53.     Huntington incorporates each and every preceding paragraph as if specifically realleged herein.

14

54.     The Flint Guaranty executed by the Flint Guaranty Defendant provide that the Flint Guaranty Defendant unconditionally and irrevocably guaranteed prompt payment of all amounts due and owing under the Flint Loan Documents.

55.     The Flint Guaranty further provides that upon a  Default, Huntington may obtain payment from the Flint Guaranty Defendant without first pursuing or exhausting against Big Sky Flint or any other person.

56.     The Flint Guaranty Defendant has failed to pay the Flint Loan as required under the Flint Note and other Flint Loan Documents.

57.     Through the Flint Guaranty, the Flint Guaranty Defendant further agreed to reimburse Huntington for all costs, attorney fees, expenses and other charges incurred in the collection or attempted collection of the amounts due.

58.     The Flint Guaranty was entered into for good and valuable consideration.

59.     The Flint Guaranty Defendant has breached his Flint Guaranty by failing to pay the amounts owed Huntington.

60.     Huntington has been damaged by the Flint Guaranty Defendant's failure to pay the outstanding principal, interest,  real estate taxes, default interest, costs, expenses, attorneys fees and all other sums due under the Flint Loan Documents.

WHEREFORE, Huntington requests this Court to:

A.     Enter a judgment in its favor and against the Flint Guaranty Defendant, jointly and severally, for the entire amount of the Flint Note, along with interest at the

15

rate set forth in the Flint Note, including the default interest and any costs, fees and real estate  taxes payable under the terms of the Flint Loan Documents or applicable law;

B.    Award Huntington all expenses and costs of collection including, attorney fees incurred in this or any other proceeding in connection with obtaining such relief; and

C.    Grant Huntington any and all further relief as the Court may deem fair, just or equitable.

**COUNT III**
**(Foreclosure of the Flint Mortgage)**

61.    Huntington incorporates each and every preceding paragraph as if specifically realleged herein.

62.    Huntington has fulfilled all of its obligations under the Flint Loan Documents, including the Flint Mortgage.

63.    Big Sky Flint defaulted in its performance of the terms and obligations of the Flint Mortgage by failing to pay the amounts owing under the Flint Loan Documents, which constitutes a Default under the Flint Mortgage.  (Ex. 1 ¶8.1; Ex. 3 ¶¶8, 12.)

64.    Upon a Default, the Flint Mortgage is subject to foreclosure. (Ex. 3 ¶¶12, 15.)

65.    No proceeding has been previously instituted to recover the debt evidenced by the Flint Note or the Flint Mortgage, or any part of it, and no part of the debt currently due and owing has been collected or paid.

WHEREFORE, Huntington requests this Court to enter an order:

16

A.      The foreclosure and sale of the Flint Property to satisfy the debts; and

B.      Determine that the rights and interests of any other potential claimants against the Flint Property are subordinate to the rights of Huntington; and

C.      Enter a deficiency judgment if the debts are not satisfied by the sale of the Flint Property; and

D.      Grant such further relief as the Court may deem fair, just or equitable.

## COUNT IV
### (Appointment of a Receiver for the Flint Property)

66.      Huntington incorporates each and every preceding paragraph as if specifically realleged herein.

67.      Pursuant to the Flint Mortgage, Huntington is entitled to the appointment of a receiver over the Flint Property in the event that Big Sky Flint is in Default which includes, but is not limited to, a failure to pay any real estate taxes or assessments when due.  (Ex. 1 ¶9.4, Ex. 3 ¶8.)  Pursuant to the Flint Mortgage, Big Sky Flint's failure to pay any taxes or assessments against the Flint Property also constitutes waste.  (Ex. 3 ¶8.)

68.      Big Sky Flint and the Flint Guaranty Defendant are in default of their obligations under the Flint Loan Documents, failed to pay the 2007 and 2008 real estate taxes on the Flint Property.

69.      Big Sky Flint and the Flint Guaranty Defendant's failure to pay the real estate taxes also entitles Huntington to the appointment of a receiver by statute.  Under MCL 600.2926, a court is empowered to appoint a receiver in all cases where allowed by law.

17

Under MCL 600.2927, a receiver may be appointed when waste is committed. The failure to pay real estate taxes constitutes waste under MCL 600.2927.

70. Huntington is further entitled to the appointment of a receiver over the Flint Property under the terms of the Flint Assignment of Leases and Rents. Pursuant to the terms of the Flint Assignment of Leases and Rents, upon a Default, Huntington is entitled to collect and receive all of the rents from the Flint Property and to the appointment of a receiver to collect those rents on its behalf. (Ex. 6 ¶¶ 8(c), 9(b).)

WHEREFORE, Huntington requests this Court to enter an order:

A. Appointing a receiver over the Flint Property with authority to operate, manage, maintain, lease, rent, license or sell the same, including but not limited to, the authority to collect rents; list the property for sale; enter into purchase agreements for the sale of the Flint Property; and, to execute and deliver such deeds, leases, other contracts or instruments necessary or proper to carry out the foregoing powers; and

B. Directing the receiver to use the proceeds from the receiver's management, use, and/or sale of the Flint Property to defray the expenses of operations, including but not limited to, payment of real estate taxes, insurance, security, personnel of the receiver actually managing and operating the Flint Property; and

C. Directing the receiver to use the proceeds of sale of the Flint Property, after payment of sale expenses, to pay down the Loan, to the extent available, with the surplus, if any, to be applied as further ordered by the Court; and

D. Grant such further relief as the Court may deem fair, just or equitable.

## FACTS UNDERLYING THE GRAND RAPIDS CLAIMS

### The Grand Rapids Loan Documents

71.     On December 19, 2003, Huntington extended a loan to Big Sky Grand Rapids (the "Grand Rapids Loan") pursuant to a Construction and End Loan Agreement entered into with Big Sky Grand Rapids, dated December 19, 2003, as amended by First Amendment to Construction and End Loan Agreement and Loan Documents, dated January 26, 2007, as further amended by Second Amendment to Construction End Loan Agreement and Loan Documents dated July 31, 2007, as further amended pursuant to a Third Amendment to Construction End Loan Agreement and Loan Documents, dated October 29, 2007, as further amended pursuant to a Fourth Modification to Promissory Note (Construction Loan) and Fourth Amendment to Construction and End Loan Agreement and Security Documents, dated October 30, 2008.  A copy of the Construction and End Loan Agreement, as amended (collectively, the "Grand Rapids Loan Agreement"), is attached as Exhibit 7.

72.     The Grand Rapids Loan was evidenced by a Promissory Note dated December 19, 2003 (the "Original Grand Rapids Note") in the original principal amount of Four Million Five Hundred Thousand and No/100ths ($4,500,000.00) Dollars, as amended pursuant to the First Modification to Promissory Note dated January 26, 2007, as further amended pursuant to the Second Modification to Promissory Note, dated July 31, 2007, as further amended pursuant to the Third Modification to Promissory Note, dated October 29, 2007, as further

amended pursuant to the Fourth Modification to Promissory Note (Construction Loan) and Fourth Amendment to Construction Loan Agreement and Security Documents dated October 30, 2008. A copy of the Original Grand Rapids Note, as amended (collectively, the "Grand Rapids Note"), is attached as Exhibit 8. The Original Grand Rapids Note, as amended among other things extended the maturity date of the Grand Rapids Loan to December 15, 2008. Big Sky Grand Rapids further acknowledged and agreed in the Grand Rapids Note that Big Sky Grand Rapids has no claims, defenses or set-offs against the Bank for the amounts owing as evidenced by the Grand Rapids Note and Grand Rapids Loan Documents and waives and/or releases any and all claims against Huntington, whether, known or unknown.

73.     As security for the Grand Rapids Loan, Big Sky Grand Rapids executed and delivered to Huntington, among other things, a Construction Mortgage, which was dated December 19, 2003 and recorded on December 29, 2003 as Instrument Number 20031229-0251207, Kent County Records ("Grand Rapids Mortgage"). A copy of the Grand Rapids Mortgage is attached as Exhibit 9. The Grand Rapids Mortgage encumbers the Grand Rapids Property.

74.     To induce Huntington to make the Grand Rapids Loan, Ian Schonsheck and the Schonsheck Trust executed a Guaranty dated December 19, 2003 (the "Schonsheck Grand Rapids Guaranty"). (Ex. 10.)

75.    The Schonsheck Grand Rapids Guaranty will be referred to as the "Grand Rapids Guaranties." Ian Schonsheck, and the Schonsheck Trust will sometimes be referred to as the "Grand Rapids Guarantor" or the "Grand Rapids Guaranty Defendant."

76.    The Grand Rapids Guaranty Defendant, by Affirmation of Guaranty dated October 30, 2008, further affirmed their respective Grand Rapids Guaranty by confirming their respective Grand Rapids Guaranty shall apply to the Grand Rapids Loan, the Grand Rapids Note and Grand Rapids Loan Agreement, as amended and extended. (Ex. 11.)

77.    Pursuant to the terms of the Grand Rapids Guaranty, the Grand Rapids Guaranty Defendant, jointly and severally, unconditionally guaranteed the payment, when due, of all indebtedness owed under the Grand Rapids Loan Documents.

78.    Pursuant to the Grand Rapids Loan Agreement, an Event of Default ("Default") includes the failure to make any payment due under the Grand Rapids Note or any of the Grand Rapids Loan Documents when and as required. (Ex. 7 ¶8.1.)

79.    Pursuant to the Grand Rapids Note and the Grand Rapids Mortgage, upon a Default, Huntington may, at its option, declare the entire unpaid indebtedness due and payable under the Grand Rapids Loan Documents without prior notice or demand. (Ex. 8; Ex. 9 ¶ 12.)

80.    Pursuant to the Grand Rapids Guaranties, upon a Default, Huntington may demand and obtain payment of all amounts due on the Grand Rapids Loan from the Grand

Rapids Guaranty Defendants without first making a demand upon, pursuing or exhausting any remedy Huntington may have against Big Sky Grand Rapids. (Ex. 10.)

81.    Pursuant to the Big Sky Mortgage, Big Sky Grand Rapids was also required to pay the real estate taxes on the Grand Rapids Property. So long as Big Sky Grand Rapids timely paid the real estate taxes, it was permitted to pay these real estate taxes directly, provided that evidence of that payment was submitted to Huntington. (Ex. 9 ¶3.) In the event however, Big Sky Grand Rapids failed to timely pay the real estate taxes, Huntington may, at its option, upon ten (10) calendar days prior notice, pay said taxes. (Ex. 9 ¶6.)

82.    The terms of the Grand Rapids Mortgage further provide that failure by Big Sky Grand Rapids to pay the real estate taxes shall constitute a waste. (Ex. 9 ¶8.) The failure by Big Sky Grand Rapids to make any payments under the terms of the Grand Rapids Note, including the payment of real estate taxes is also a Default under the Grand Rapids Loan Documents. The terms of the Grand Rapids Mortgage further provide that upon a Default, including the failure to timely pay the real estate taxes, Huntington is entitled to the appointment of a receiver as a matter of right. (Ex. 9 ¶8.) Further, Big Sky Grand Rapids expressly consented to a receiver upon a Default, and expressly waived any defense it may have to such appointment. (Ex. 7 ¶9.4; Ex. 9 ¶8.) Big Sky Grand Rapids also expressly consented to a receiver after filing a complaint to foreclose the Grand Rapids Mortgage. (Ex. 7 ¶9.4.)

83.    As additional security for the Grand Rapids Loan, Big Sky Grand Rapids executed an Assignment of Leases and Rents, which was timely recorded with the Kent County Records.  A copy of the Grand Rapids Assignment of Leases and Rents, as amended is attached as Ex. 12.

84.    Pursuant to the Grand Rapids Assignment of Leases and Rents, upon a Default, Huntington is entitled to receive and collect all rents from the Grand Rapids Property either personally or through a receiver.  (Ex. 12 ¶ 8(c).)

**Big Sky Grand Rapids' and the Grand Rapids Guaranty Defendant's Default**

85.    Under the terms of the Grand Rapids Note, the Grand Rapids Loan matured on December 15, 2008 (the "Grand Rapids Maturity Date").  Big Sky Grand Rapids was, on the Grand Rapids Maturity Date, required to pay in full, all unpaid principal, interest and other sums owed under the Grand Rapids Loan Documents.  (Ex. 9.)

86.    Under the terms of the Grand Rapids Mortgage, Big Sky Grand Rapids was also required, in accordance with the procedures previously described, to pay the real estate taxes on the Grand Rapids Property.

87.    Big Sky Grand Rapids and the Grand Rapids Guaranty Defendant defaulted on their obligations under the Grand Rapids Loan Documents by failing to pay in full all unpaid principal, interest and other sums owed under the Grand Rapids Loan Documents, and by further failing to pay the real estate taxes on the Grand Rapids Property for 2007 and 2008

23

(collectively, the "Grand Rapids Payment Defaults"). The real estate taxes for 2007 and 2008 remain unpaid and owing.

88.    As a result of these Grand Rapids Payment Defaults, Huntington had the right to immediately exercise all of its rights and remedies under the Grand Rapids Loan Documents against Big Sky Grand Rapids and the Grand Rapids Guaranty Defendant including the right to accelerate and immediately collect all principal, interest and other sums due under the Grand Rapids Loan.

89.    As of January 12, 2010, the unpaid principal on the Grand Rapids Loan was $4,400,000.00. Additionally, Big Sky Grand Rapids and the Grand Rapids Guaranty Defendant owe accrued interest, late fees, real estate taxes, default interest, costs, expenses and attorneys' fees incurred prior to January 12, 2010, and which continue to accrue thereafter.

## CLAIMS RELATING TO THE GRAND RAPIDS LOAN

### COUNT V
**(Breach of Grand Rapids Note and Other Grand Rapids Loan Documents)**

90.    Huntington incorporates each and every preceding paragraph as if specifically alleged herein.

91.    The Grand Rapids Loan Documents were entered into for good and valuable consideration.

24

92.    Big Sky Grand Rapids has failed to pay the Grand Rapids Loan as required under the Grand Rapids Note and other Grand Rapids Loan Documents.

93.    Big Sky Grand Rapids has failed to pay the 2007 and 2008 real estate taxes on the Grand Rapids Property.

94.    By failing to pay the Grand Rapids Loan as required under the Grand Rapids Note and other Grand Rapids Loan Documents, and by failing to pay the real estate taxes, Big Sky Grand Rapids has breached the Grand Rapids Note and other Grand Rapids Loan Documents and a Default has occurred under the Grand Rapids Loan Documents.

95.    The Grand Rapids Note provides that without notice to Big Sky Grand Rapids, Huntington may declare the entire unpaid debt on the Grand Rapids Loan to be immediately due and payable.

96.    Big Sky Grand Rapids has a duty under the Grand Rapids Loan Documents to pay the outstanding principal, interest, real estate taxes, default interest, costs, expenses, attorneys fees and all other sums due under the Grand Rapids Loan Documents.

97.    Big Sky Grand Rapids has breached this duty by failing to pay the outstanding principal, interest, real estate taxes, default interest, costs, expenses, attorneys fees and all other sums due under the Grand Rapids Loan Documents.

98.     Huntington has been damaged by Big Sky Grand Rapids' failure to pay the outstanding principal, interest, real estate taxes, default interest, costs, expenses, attorneys fees and all other sums due under the Grand Rapids Loan Documents.

WHEREFORE, Huntington respectfully requests that this Court:

A.      Enter a judgment in its favor and against Big Sky Grand Rapids for the entire principal amount of the Grand Rapids Note, along with interest at the rate set forth in the Grand Rapids Note, including the default interest and any costs, fees and real estate taxes;

B.      Award all expenses and costs of collection, including attorneys' fees, incurred by Huntington in this or any other proceeding in connection with obtaining such relief; and

C.      Grant any and all further relief as the Court may deem to be fair, just, or equitable.

### COUNT VI
### (Breach of Grand Rapids Guaranty)

99.     Huntington incorporates each and every preceding paragraph as if specifically realleged herein.

100.    The Grand Rapids Guaranty executed by the Grand Rapids Guaranty Defendant provides that the Grand Rapids Guaranty Defendant unconditionally and irrevocably guaranteed prompt payment of all amounts due and owing under the Grand Rapids Loan Documents.

101.    The Grand Rapids Guaranty further provides that upon a Default, Huntington may obtain payment from the Grand Rapids Guaranty Defendant without first pursuing or exhausting against Big Sky Grand Rapids or any other person.

102.    The Grand Rapids Guaranty Defendant has failed to pay the Grand Rapids Loan as required under the Grand Rapids Note and other Grand Rapids Loan Documents.

103.    Through the Grand Rapids Guaranty, the Grand Rapids Guaranty Defendant further agreed to reimburse Huntington for all costs, attorney fees, expenses and other charges incurred in the collection or attempted collection of the amounts due.

104.    The Grand Rapids Guaranty was entered into for good and valuable consideration.

105.    The Grand Rapids Guaranty Defendant has breached the Grand Rapids Guaranty by failing to pay the amounts owed Huntington.

106.    Huntington has been damaged by the Grand Rapids Guaranty Defendant's failure to pay the outstanding principal, interest, real estate taxes, default interest, costs, expenses, attorneys fees and all other sums due under the Grand Rapids Loan Documents.

WHEREFORE, Huntington requests this Court to:

A.    Enter a judgment in its favor and against each of the Grand Rapids Guaranty Defendant, jointly and severally, for the entire amount of the Grand Rapids Note, along with interest at the rate set forth in the Grand Rapids Note, including the default interest and any costs, fees and real estate taxes payable under the terms of the Grand Rapids Loan Documents or applicable law;

B.   Award Huntington all expenses and costs of collection including, attorney fees incurred in this or any other proceeding in connection with obtaining such relief; and

C.   Grant Huntington any and all further relief as the Court may deem fair, just or equitable.

## COUNT VII
### (Foreclosure of Grand Rapids Mortgage)

107.   Huntington incorporates each and every preceding paragraph as if specifically realleged herein.

108.   Huntington has fulfilled all of its obligations under the Grand Rapids Loan Documents, including the Grand Rapids Mortgage.

109.   Big Sky Grand Rapids defaulted in its performance of the terms and obligations of the Grand Rapids Mortgage by failing to pay the amounts owing under the Grand Rapids Loan Documents, which constitutes a Default under the Grand Rapids Mortgage.  (Ex. 7 ¶8.1; Ex. 9 ¶¶8, 12.)

110.   Upon a Default, the Grand Rapids Mortgage is subject to foreclosure.  (Ex. 9; ¶¶12, 15.)

111.   No proceeding has been previously instituted to recover the debt evidenced by the Grand Rapids Note or the Grand Rapids Mortgage, or any part of it, and no part of the debt currently due and owing has been collected or paid.

WHEREFORE, Huntington requests this Court to enter an order:

28

A.     The foreclosure and sale of the Grand Rapids Property to satisfy the debts; and

B.     Determine that the rights and interests of any other potential claimants against the Grand Rapids Property are subordinate to the rights of Huntington;

C.     Enter a deficiency judgment if the debts are not satisfied by the sale of the Grand Rapids Property; and

D.     Grant such further relief as the Court may deem fair, just or equitable.

<u>**COUNT VIII**</u>
**(Appointment of a Receiver for the Grand Rapids Property)**

112.    Huntington incorporates each and every preceding paragraph as if specifically realleged herein.

113.    Pursuant to the Grand Rapids Mortgage, Huntington is entitled to the appointment of a receiver over the Grand Rapids Property in the event that Big Sky Grand Rapids is in Default which includes, but is not limited to, a failure to pay any real estate taxes or assessments when due.  (Ex. 7 ¶9.4, Ex. 9 ¶8.)  Pursuant to the Grand Rapids Mortgage, Big Sky Grand Rapids' failure to pay any taxes or assessments against the Grand Rapids Property also constitutes waste.  (Ex. 9 ¶8.)

114.    Big Sky Grand Rapids and the Grand Rapids Guaranty Defendant, in default of their obligations under the Grand Rapids Loan Documents, failed to pay the 2007 and 2008 real estate taxes on the Grand Rapids Property.

115.    Big Sky Grand Rapids and the Grand Rapids Guaranty Defendant's failure to pay the real estate taxes also entitles Huntington to the appointment of a receiver by statute.

29

Under MCL 600.2926, a court is empowered to appoint a receiver in all cases where allowed by law.  Under MCL 600.2927, a receiver may be appointed when waste is committed.  The failure to pay real estate taxes constitutes waste under MCL 600.2927.

116.    Huntington is further entitled to the appointment of a receiver over the Grand Rapids Property under the terms of the Grand Rapids Assignment of Leases and Rents. Pursuant to the terms of the Grand Rapids Assignment of Leases and Rents, upon a Default, Huntington is entitled to collect and receive all of the rents from the Grand Rapids Property and to the appointment of a receiver to collect those rents on its behalf.  (Ex. 12 ¶¶ 8(c), 9(b).)

WHEREFORE, Huntington requests this Court to enter an order:

A.    Appointing a receiver over the Grand Rapids Property with authority to operate, manage, maintain, lease, rent, license or sell the same, including but not limited to, the authority to collect rents; list the property for sale; enter into purchase agreements for the sale of the Grand Rapids Property; and, to execute and deliver such deeds, leases, other contracts or instruments necessary or proper to carry out the foregoing powers; and

B.    Directing the receiver to use the proceeds from the receiver's management, use, and/or sale of the Grand Rapids Property to defray the expenses of operations, including but not limited to, payment of real estate taxes, insurance, security, personnel of the receiver actually managing and operating the Grand Rapids Property;

C.    Directing the receiver to use the proceeds of sale of the Grand Rapids Property, after payment of sale expenses, to pay down the Grand Rapids Loan, to the extent available, with the surplus, if any, to be applied as further ordered by the Court; and

D.      Grant such further relief as the Court may deem fair, just or equitable.

## FACTS UNDERLYING THE SALINE CLAIMS

### The Saline Loan Documents

117.    On March 13, 2003, Huntington extended a loan to Big Sky Saline (the "Saline Loan") pursuant to a Construction Loan Agreement entered into with Borrower, dated March 13, 2003, as amended by First Amendment to Construction Loan Agreement and Collateral Documents, dated April 20, 2006, as further amended by Second Amendment to Construction Loan Agreement and Collateral Documents dated September 25, 2006, as further amended pursuant to a Third Amendment to Construction Loan Agreement and Collateral Documents, dated January 26, 2007, as further amended pursuant to a Fourth Amendment to Construction Loan Agreement and Collateral Documents, dated July 31, 2007, as further amended pursuant to a Fifth Amendment to Construction Loan Agreement and Collateral Documents, dated October 29, 2007, as further amended pursuant to Sixth Modification to Promissory Note (Construction Loan) and Sixth Amendment to Construction Loan Agreement and Security Documents dated October 30, 2008. A copy of the Loan Agreement, as amended (collectively, the "Saline Loan Agreement"), is attached as Ex. 13.

118.    The Saline Loan was evidenced by a Promissory Note dated March 13, 2003 (the "Original Saline Note") in the original principal amount of Five Million Two Hundred Thousand and No/100ths ($5,200,000.00) Dollars, as amended pursuant to the First

Modification to Promissory Note dated April 20, 2006, as further amended pursuant to the Second Modification to Promissory Note, dated September 25, 2006, as further amended pursuant to the Third Modification to Promissory Note, dated January 26, 2007, as further amended pursuant to the Fourth Modification to Promissory Note, dated July 31, 2007, as further amended pursuant to the Fifth Modification to Promissory Note, dated October 29, 2007, as further amended pursuant to the Sixth Modification to Promissory Note (Construction Loan) and Sixth Amendment to Construction Loan Agreement and Security Documents dated October 30, 2008. A copy of the Original Saline Note, as amended (collectively, the "Saline Note"), is attached as Ex. 14. The Original Saline Note, as amended (the Note), among other things increased the principal amount of the Loan to Five Million Five Hundred-Fifty Thousand and No/100ths ($5,550,000.00) Dollars and extended the maturity date of the Loan to December 15, 2008. Big Sky Saline further acknowledged and agreed in the Saline Note that Big Sky Saline has no claims, defenses or set-offs against the Bank for the amounts owing as evidenced by the Saline Note and Saline Loan Documents and waives and/or releases any and all claims against Huntington, whether, known or unknown.

119. As security for the Saline Loan, Big Sky Saline executed and delivered to Huntington, among other things, a Construction Mortgage, which was dated March 13, 2003 and recorded on March 21, 2003 at Liber 4235, Page 90, Washtenaw County Records,

as amended by First Amendment to Mortgage, which was dated April 20, 2007 and recorded on April 27, 2006 at Liber 4553, page 929, Washtenaw County Records. A copy of the Mortgage, as amended (collectively, the "Saline Mortgage"), is attached as Exhibit 15. The Saline Mortgage encumbers the Saline Property.

120.    To induce Huntington to make the Saline Loan, Ian W. Schonsheck and the Schonsheck Trust executed a Guaranty dated March 13, 2003 (the "Schonsheck Saline Guaranty"). (Ex. 16.)

121.    To further induce Huntington to make the Saline Loan, Stephan J. Dackiw and the Dackiw Trust executed a Guaranty dated 2003 (the "Dackiw Saline Guaranty"). (Ex. 17.)

122.    To further induce Huntington to make the Loan, Richard J. Hartigan and the Hartigan Trust executed a Guaranty dated 2003 (the "Hartigan Saline Guaranty"). (Ex. 18.)

123.    To further induce Huntington to make the Saline Loan, Hyman Stollman and the Stollman Trust executed a Guaranty dated March 13, 2003 (the "Stollman Saline Guaranty"). (Ex. 19.)

124.    The Schonsheck Saline Guaranty, Dackiw Saline Guaranty, Hartigan Saline Guaranty, Hagen Saline Guaranty and Stollman Saline Guaranty are collectively, the "Saline Guaranties." The defendants who executed the Saline Guaranties will sometimes be referred to as the "Saline Guarantors" or the "Saline Guaranty Defendants."

125.    The Saline Guaranty Defendants, by Affirmation of Guaranty dated October 30, 2008, further affirmed their respective Saline Guaranties by confirming their respective Saline Guaranties shall apply to the Saline Loan, the Saline Note and Saline Loan Agreement, as amended and extended.  (Ex. 20.)

126.    Pursuant to the terms of the Saline Guaranties, the Saline Guaranty Defendants, jointly and severally, unconditionally guaranteed the payment, when due, of all indebtedness owed under the Saline Loan Documents.

127.    Pursuant to the Saline Loan Agreement, an Event of Default ("Default") includes the failure to make any payment due under the Saline Note or any of the Saline Loan Documents when and as required.  (Ex. 13, ¶8.1.)

128.    Pursuant to the Saline Note and the Saline Mortgage, upon a Default, Huntington may, at its option, declare the entire unpaid indebtedness due and payable under the Saline Loan Documents without prior notice or demand.  (Ex. 14; Ex. 15 ¶ 12.)

129.    Pursuant to the Saline Guaranties, upon a Default, Huntington may demand and obtain payment of all amounts due on the Saline Loan from the Saline Guaranty Defendants without first making a demand upon, pursuing or exhausting any remedy Huntington may have against Big Sky Saline.  (Exs.16-20.)

130.    Pursuant to the Saline Mortgage, Big Sky Saline was also required to pay the real estate taxes on the Saline Property.  So long as Big Sky Saline timely paid the real estate

taxes, it was permitted to pay these real estate taxes directly, provided that evidence of that payment was submitted to Huntington. (Ex. 15 ¶3.) In the event however, Big Sky Saline failed to timely pay the real estate taxes, Huntington, may, at its option, upon ten (10) calendar days prior notice, pay said taxes. (Ex. 15 ¶6.)

131. The terms of the Saline Mortgage further provide that failure by Big Sky Saline to pay the real estate taxes shall constitute a waste. (Ex. 15 ¶8.) The failure by Big Sky Saline to make any payments under the terms of the Saline Note, including the payment of real estate taxes is also a Default under the Saline Loan Documents. The terms of the Saline Mortgage further provide that upon a Default, including the failure to timely pay the real estate taxes, Huntington is entitled to the appointment of a receiver as a matter of right. (Ex. 15 ¶8.) Further, Big Sky Saline expressly consented to the appointment of a receiver upon a Default and expressly waived any defense it may have to such appointment. (Ex. 15 ¶8.) Big Sky Saline also expressly consented to the appointment of a receiver after filing a complaint to foreclose the Saline Mortgage. (Ex. 13 ¶9.4.)

132. As additional security for the Saline Loan, Big Sky Saline executed an Assignment of Leases and Rents, as amended by a First Amendment to Assignment of Leases and Rents, which were timely recorded with the Washtenaw County Records. A copy of the Saline Assignment of Leases and Rents, as amended is attached as Ex. 21.

133.   Pursuant to the Saline Assignment of Leases and Rents, upon a Default, Huntington is entitled to receive and collect all rents from the Saline Property either personally or through a receiver.  Ex. 21 ¶ 8(c).

**Big Sky Saline's and the Saline Guaranty Defendants' Default**

134.   Under the terms of the Saline Note, the Saline Loan matured on December 15, 2008 (the "Saline Maturity Date").   Big Sky Saline was, on the Saline Maturity Date, required to pay in full, all unpaid principal, interest and other sums owed under the Saline Loan Documents.  (Ex. 14.)

135.   Under the terms of the Saline Mortgage, Big Sky Saline was also required, in accordance with the procedures previously described, to pay the real estate taxes on the Saline Property.

136.   Big Sky Saline and the Saline Guaranty Defendants defaulted on their obligations under the Saline Loan Documents by failing to pay in full all unpaid principal, interest and other sums owed under the Saline Loan Documents, and by further failing to pay the real estate taxes on the Saline Property for 2007 and 2008 (collectively, the "Saline Payment Defaults").  The real estate taxes for 2007 and 2008 remain unpaid and owing.

137.   As a result of the Saline Payment Defaults, Huntington had the right to immediately exercise all of its rights and remedies under the Saline Loan Documents against

Big Sky Saline and the Saline Guaranty Defendants including the right to accelerate and immediately collect all principal, interest and other sums due under the Saline Loan.

138.   As of January 12, 2010, the unpaid principal on the Saline Loan was $5,486,207.82.   Additionally, Big Sky Saline and the Saline Guaranty Defendants owe accrued interest, late fees, real estate taxes, default interest, costs, expenses and attorneys' fees incurred prior to January 12, 2010, and which continue to accrue thereafter.

## CLAIMS RELATING TO THE SALINE LOAN

### COUNT IX
### (Breach of the Saline Note and other Saline Loan Documents)

139.   Huntington incorporates each and every preceding paragraph as if specifically alleged herein.

140.   The Saline Loan Documents were entered into for good and valuable consideration.

141.   Big Sky Saline has failed to pay the Saline Loan as required under the Saline Note and other Saline Loan Documents.

142.   Big Sky Saline has failed to pay the 2007 and 2008 real estate taxes on the Saline Property.

143.   By failing to pay the Saline Loan as required under the Saline Note and other Saline Loan Documents, and by failing to pay the real estate taxes, Big Sky Saline has

breached the Saline Note and other Saline Loan Documents and a Default has occurred under the Saline Loan Documents.

144.    The Saline Note provides that without notice to Big Sky Saline, Huntington may declare the entire unpaid debt on the Saline Loan to be immediately due and payable.

145.    Big Sky Saline has a duty under the Saline Loan Documents to pay the outstanding principal, interest, real estate taxes, default interest, costs, expenses, attorneys fees and all other sums due under the Saline Loan Documents.

146.    Big Sky Saline has breached this duty by failing to pay the outstanding principal, interest, real estate taxes, default interest, costs, expenses, attorneys fees and all other sums due under the Saline Loan Documents.

147.    Huntington has been damaged by Big Sky Saline's failure to pay the outstanding principal, interest, real estate taxes, default interest, costs, expenses, attorneys fees and all other sums due under the Saline Loan Documents.

WHEREFORE, Huntington respectfully requests that this Court:

A.    Enter a judgment in its favor and against Big Sky Saline for the entire principal amount of the Saline Note, along with interest at the rate set forth in the Saline Note, including the default interest and any costs, fees and real estate taxes;

B.    Award all expenses and costs of collection, including attorneys' fees, incurred by Huntington in this or any other proceeding in connection with obtaining such relief; and

C.    Grant any and all further relief as the Court may deem to be fair, just, or equitable.

## COUNT X
**(Breach of Saline Guaranty)**

148.    Huntington incorporates each and every preceding paragraph as if specifically realleged herein.

149.    The Saline Guaranties executed by the Saline Guaranty Defendants provide that the Saline Guaranty Defendants unconditionally and irrevocably guaranteed prompt payment of all amounts due and owing under the Saline Loan Documents.

150.    The Saline Guaranties further provides that upon a Default, Huntington may obtain payment from the Saline Guaranty Defendants without first pursuing or exhausting against Big Sky Saline or any other person.

151.    The Saline Guaranty Defendants have failed to pay the Saline Loan as required under the Saline Note and other Saline Loan Documents.

152.    Through the respective Saline Guaranties, each Saline Guaranty Defendant further agreed to reimburse Huntington for all costs, attorney fees, expenses and other charges incurred in the collection or attempted collection of the amounts due.

153.    The Saline Guaranties were entered into for good and valuable consideration.

154.    The Saline Guaranty Defendants have breached their respective Saline Guaranties by failing to pay the amounts owed Huntington.

39

155.    Huntington has been damaged by the Saline Guaranty Defendant's failure to pay the outstanding principal, interest,  real estate taxes, default interest, costs, expenses, attorneys fees and all other sums due under the Saline Loan Documents.

WHEREFORE, Huntington requests this Court to:

A.    Enter a judgment in its favor and against each of the Saline Guaranty Defendants, jointly and severally, for the entire amount of the Saline Note, along with interest at the rate set forth in the Saline Note, including the default interest and any costs, fees and real estate taxes payable under the terms of the Saline Loan Documents or applicable law;

B.    Award Huntington all expenses and costs of collection including, attorney fees incurred in this or any other proceeding in connection with obtaining such relief; and

C.    Grant Huntington any and all further relief as the Court may deem fair, just or equitable.

## COUNT XI
### (Foreclosure of Saline Mortgage)

156.    Huntington incorporates each and every preceding paragraph as if specifically realleged herein.

157.    Huntington has fulfilled all of its obligations under the Saline Loan Documents, including the Saline Mortgage.

158.    Big Sky Saline defaulted in its performance of the terms and obligations of the Saline Mortgage by failing to pay the amounts owing under the Saline Loan Documents, which constitutes a Default under the Saline Mortgage. (Ex. 13 ¶8.1; Ex. 15 ¶¶8, 12.)

40

159.    Upon a Default, the Saline Mortgage is subject to foreclosure.  (Ex. 15 ¶¶12, 15.)

160.    No proceeding has been previously instituted to recover the debt evidenced by the Saline Note or the Saline Mortgage, or any part of it, and no part of the debt currently due and owing has been collected or paid.

WHEREFORE, Huntington requests this Court to enter an order:

A.    The foreclosure and sale of the Saline Property to satisfy the debts;

B.    Determine that the rights and interests of any other potential claimants against the Saline Property are subordinate to the rights of Huntington;

C.    Enter a deficiency judgment if the debts are not satisfied by the sale of the Saline Property; and

D.    Grant such further relief as the Court may deem fair, just or equitable.

### COUNT XII
#### (Appointment of a Receiver for the Saline Property)

161.    Huntington incorporates each and every preceding paragraph as if specifically realleged herein.

162.    Pursuant to the Saline Mortgage, Huntington is entitled to the appointment of a receiver over the Saline Property in the event that Big Sky Saline is in Default which includes, but is not limited to, a failure to pay any real estate taxes or assessments when due.

(Ex. 13 ¶9.4, Ex. 15 ¶8.)  Pursuant to the Saline Mortgage, Big Sky Saline's failure to pay any taxes or assessments against the Saline Property also constitutes waste.  (Ex. 15 ¶8.)

163.   Big Sky Saline and the Saline Guaranty Defendants, in default of their obligations under the Saline Loan Documents, failed to pay the 2007 and 2008 real estate taxes on the Saline Property.

164.   Big Sky Saline and the Saline Guaranty Defendants' failure to pay the real estate taxes also entitles Huntington to the appointment of a receiver by statute.  Under MCL 600.2926, a court is empowered to appoint a receiver in all cases where allowed by law.  Under MCL 600.2927, a receiver may be appointed when waste is committed.  The failure to pay real estate taxes constitutes waste under MCL 600.2927.

165.   Huntington is further entitled to the appointment of a receiver over the Saline Property under the terms of the Saline Assignment of Leases and Rents.  Pursuant to the terms of the Saline Assignment of Leases and Rents, upon a Default, Huntington is entitled to collect and receive all of the rents from the Saline Property and to the appointment of a receiver to collect those rents on its behalf.  (Ex. 21 ¶¶ 8(c), 9(b).)

WHEREFORE, Huntington requests this Court to enter an order:

A.   Appointing a receiver over the Saline Property with authority to operate, manage, maintain, lease, rent, license or sell the same, including but not limited to, the authority to collect rents; list the property for sale; enter into purchase agreements for the sale of the Saline Property; and, to execute and deliver such deeds, leases, other contracts or instruments necessary or proper to carry out the foregoing powers;

42

B.    Directing the receiver to use the proceeds from the receiver's management, use, and/or sale of the Saline Property to defray the expenses of operations, including but not limited to, payment of real estate taxes, insurance, security, personnel of the receiver actually managing and operating the Saline Property;

C.    Directing the receiver to use the proceeds of sale of the Saline Property, after payment of sale expenses, to pay down the Saline Loan, to the extent available, with the surplus, if any, to be applied as further ordered by the Court; and

D.    Grant such further relief as the Court may deem fair, just or equitable.

BARRIS, SOTT, DENN & DRIKER, P.L.L.C.

By:   /s/ Josh J. Moss
         C. David Bargamian (P43742)
         Josh J. Moss (P64406)
Attorneys for Plaintiff
211 W. Fort Street, 15th Floor
Detroit, Michigan 48226-3281
(313) 965-9725
dbargamian@bsdd.com
jmoss@bsdd.com

Dated: January 26, 2010

#385487